<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TRUCKING EMPLOYEES OF NORTH JERSEY WELFARE FUND, INC. - PENSION FUND, | : : : : | Civil Action No. 09-1863 (SRC) |
| Appellant, | : : | **OPINION** |
| v. | : : | |
| MARCAL PAPER MILLS, INC., | : : | |
| Appellee. | : | |

<u>**CHESLER**</u>, District Judge

      This matter comes before the Court on the appeal of an order entered by the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court") in the proceedings captioned <u>In the Matter of: Marcal Paper Mills, Inc.</u>, Case No. 06-21886 (MS).  Appellant Trucking Employees of North Jersey Welfare Fund, Inc. - Pension Fund ("Appellant" or "TENJ Pension Fund"), a claimant in the underlying bankruptcy proceedings, appeals from the Bankruptcy Court's February 17, 2009 Order insofar as the order determined that no portion of its withdrawal liability claim against debtor Marcal Paper Mills, Inc. (the "Debtor" or "Marcal") was entitled to administrative expense treatment and reclassified the claim, Claim no. 918, as a general unsecured non-priority claim in its entirety.  The response to this appeal has been filed by NexBank, SSB and Marcal Paper Mills, LLC, as the latter has assumed liability for the withdrawal liability at issue in Claim no. 918, pursuant to an asset purchase agreement between

the Debtor and NexBank, SSB.[1]  (The Court will refer to NexBank, SSB and Marcal Paper Mills, LLC collectively as "Appellees.")  The Court has considered the papers submitted by the parties and opts to rule on the motion without oral argument, pursuant to Federal Rule of Bankruptcy Procedure 8012.  For the reasons discussed below, the Court will reverse the appealed portion of the February 17, 2009 and remand this action to the Bankruptcy Court for apportionment of Claim no. 918 consistent with this Opinion.

## I. BACKGROUND

This bankruptcy appeal concerns the proper classification of a claim made by Appellant and creditor, TENJ Pension Fund, in the Chapter 11 proceedings initiated by Debtor Marcal on November 30, 2006.  The Court will review the relationship between TENJ Pension Fund and Marcal as well as the procedural history of this appeal.

TENJ Pension Fund is the multiemployer pension plan for members of Teamsters Union Local 560 ("Local 560").  Local 560 was the collective bargaining representative of the truck drivers employed by Marcal.  Over the years, Local 560 and Marcal were parties to collective bargaining agreements, with the latest one expiring on September 15, 2007.  Marcal, which continued in business as a debtor-in-possession after filing for Chapter 11 protection, entered into

---

[1] By Order of January 29, 2008, the Bankruptcy Court approved the sale of the Debtor's assets pursuant to the Amended and Restated Asset Purchase Agreement By and Between Marcal Paper Mills, Inc. and NexBank, SSB (the "APA").  Under the APA, Marcal Paper Mills, LLC acquired all or substantially all of the Debtor's assets and also, in relevant part, assumed liability for any withdrawal liability to the Appellant pension fund that is determined to be a post-petition administrative expense.  Moreover, although the Debtor has ceased to exist, the Bankruptcy Court's order confirming the Debtor's plan of liquidation expressly granted standing to Marcal Paper Mills, LLC and NexBank, SSB to prosecute and object to any claim that is or could be asserted to be an assumed liability of theirs, such as the withdrawal liability at issue.

a Memorandum of Understanding with Local 560 on August 16, 2007 continuing the terms of their collective bargaining agreement pending negotiation of a new contract.  Marcal and Local 560 did not, however, enter into a new contract, and Local 560 was unable to negotiate a collective bargaining agreement with Marcal's purchaser.

In any event, the collective bargaining agreement under which Marcal operated until it ceased operations required it to remit monthly contributions to TENJ Pension Fund on behalf of all Local 560 members employed by Marcal.  Marcal made all required contributions between the date it filed its Chapter 11 petition and May 30, 2008, the date on which the sale of Marcal's assets to Marcal Paper Mills, LLC was consummated.  The parties agree that as of that date, Marcal had no further obligation to make contributions to TENJ Pension Fund.[2]  In light of the fact that Debtor Marcal ceased to exist and ceased to employ truck drivers represented by Local 560, TENJ Pension Fund determined that Marcal had a "complete withdrawal" from TENJ Pension Fund within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381, et seq.[3]  It accordingly assessed a withdrawal liability of $5,890,128 against Marcal pursuant to statute.  The withdrawal liability assessment encompasses

---

[2] Local 560 employees decided not to work for Marcal Paper Mills, LLC, the purchaser, after efforts to strike a collective bargaining agreement ultimately failed in May 2008.

[3] The statute defines "complete withdrawal" as occurring when an employer (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan.  29 U.S.C. § 1383(a).

Marcal's employment of Local 560 bargaining unit employees and related contributions to the TENJ Pension Fund on their behalf both before and after Marcal filed its petition for bankruptcy protection under Chapter 11.

On July 27, 2008, TENJ Pension Fund filed a claim for the entire amount of withdrawal liability as a post-petition administrative claim under 11 U.S.C. § 503(b). Marcal, however, objected to administrative status for the claim and filed a motion to reclassify it. (Appellees joined in the Debtor's objection.) TENJ Pension Fund countered that it sought administrative claim status only for that portion of the withdrawal liability attributable to post-petition services by bargaining unit employees for debtor-in-possession Marcal. The Honorable Morris Stern, sitting below, issued an Order on February 17, 2009 which, in relevant part, reclassified the entire claim for withdrawal liability, Claim no. 918, as a general unsecured non-priority claim.

TENJ Pension Plan filed the instant appeal on February 25, 2009.

**II.    DISCUSSION**

This Court has jurisdiction to hear appeals of the final judgments and orders of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). The February 17, 2009 Order on appeal is a final order because it determined a discrete issue within the bankruptcy proceedings, specifically that a claim filed by the Appellant creditor is not entitled to administrative expense priority. In re Saco Local Dev. Corp., 711 F.2d 441, 444 (1st Cir. 1983) (majority opinion of Breyer, J.) ("Congress has long provided that orders in bankruptcy cases may be immediately appealed if they finally dispose of *discrete disputes within the larger case* - and in particular, it has long provided that orders finally settling creditors' claims are separately appealable"

4

(emphasis in original)); see also In re HNRC Dissolution Co., 396 B.R. 461, 465 (B.A.P. 6th Cir. 2008) (treating order denying priority administrative expense status for claim as final).   This appeal concerns one purely legal matter, and thus the Court reviews the Bankruptcy Court's order on a de novo standard.  In re American Pad & Paper Co., 478 F.3d 546, 551 (3d Cir. 2007); see also Fed. R. Bankr. P. 8013.

The question on appeal is: did the Bankruptcy Court err in (1) determining that the portion of the TENJ Pension Fund's withdrawal liability claim attributable to services rendered and compensation earned by bargaining unit employees in their post-petition work for debtor-in-possession Marcal is not entitled to treatment as an administrative expense of the bankruptcy estate and (2) in failing to apportion the withdrawal liability claim accordingly?  This issue is one of first impression in the Third Circuit, and thus the Court has consulted various other jurisdictions' analyses.

Indeed, Judge Stern's opinion in connection with the order on appeal acknowledges the absence of any guidance as to how the Third Circuit would resolve this issue and relies on HNRC,  a recent decision by the Bankruptcy Appellate Panel for the Sixth Circuit.  HNRC is one of the few cases nationwide to address the issue before the court below and, it appears, the only one to deal directly with the apportionment of withdrawal liability into pre- and post-petition components, such that the liability predicated on post-petition work could be treated as an administrative expense.  Having itself reviewed the applicable statutes and available caselaw, this Court acknowledges that Judge Stern tackled a difficult and novel question.  He ultimately concluded, in reliance on HNRC, that the withdrawal liability of a debtor to a multiemployer pension fund is subject to so many factors unrelated to the services rendered to the debtor that no

portion of the withdrawal liability directly relates to post-petition labor and cannot, therefore, be considered to confer a benefit on the debtor's bankruptcy estate.  (2/3/09 Tr. 7:412,12:24 - 14:10.)  As this Opinion will discuss below, this Court disagrees with HNRC's approach to the issue.

Before giving the reasons for its holding, the Court will provide a brief overview of the framework of statutory and decisional law out of which the issue before it arises.

The first item the Court turns to is defining withdrawal liability.  Simply put, it is an obligation on an employer, triggered by its withdrawal from a multiemployer pension plan to which the employer has been contributing, to pay the plan the employer's share of "unfunded vested benefits" accrued by beneficiaries of the plan in their work for the employer.  29 U.S.C. § 1381.  Amending ERISA by enactment of the MPPAA, Congress imposed the obligation in recognition of the adverse effect that the withdrawal of a contributing employer from a multiemployer pension plan can have on the plan's solvency and its ability to meet plan participants' future vested pension liabilities.  29 U.S.C. § 1001a; Bd. of Trustees of Trucking Employees of N. Jersey Welfare Fund, Inc. - Pension Fund v. Gotham Fuel Corp., 860 F.Supp. 1044, 1047 (D.N.J. 1993) (citing IUE AFL-CIO Pension Fund v. Baker & Williamson, Inc., 788 F.2d 118, 127 (3d Cir. 1986); see also Local 478 Trucking and Allied Indus. Pension Fund v. Jayne, 778 F.Supp. 1289, 1302 (D.N.J. 1991) (noting that withdrawal liability under the MPPAA seeks to "discourage employers from withdrawing from multiemployer pension plans and leaving plans with inadequately funded liabilities.").  The withdrawal liability consists of "the employer's proportionate share of the plan's unfunded vested benefits calculated as the difference between the present value of the vested benefits and the current value of the plan's assets."  Pension

Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 725 (1984).  The MPPAA sets various methods for computing the employer's proportionate share of underfunding.  29 U.S.C. § 1391.  "These statutory methods generally base the allocation on 'the comparative number of the employer's covered workers in each earlier year and the related level of the employer's contributions.'"  In re HNRC Dissolution Co., 396 B.R. at 472 (quoting Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co., 513 U.S. 414, 417 (1995)).  Because withdrawal liability is based in part on plan underfunding, it will depend on various factors unrelated to the withdrawing employer, such as the contributions made by all employers to the fund, performance of the pension plan's investments, benefit levels for which the plan is responsible, and actuarial assumptions made in determining the present value of vested benefits and the valuation of the plan's assets.  See In re HNRC Dissolution Co., 396 B.R. at 472-73; In re CD Realty Partners, 205 B.R. 651, 658 (Bankr. D.Mass. 1997); see also Milwaukee Brewery, 513 U.S. at 417 (noting that under MPPAA, calculating withdrawal liability is a two-step process, involving first, determining the amount of the plan's unfunded vested benefits and second, allocation of the withdrawing employer's share ).  The withdrawing employer's proportionate share of the underfunding seeks to capture the amount of "vested but unfunded benefits attributable to work already performed" for the employer by individuals covered by the plan.  Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 103 (2d Cir. 1986).  Indeed, the Second Circuit has reasoned that [t]he manner in which the MPPAA calculates withdrawal liability represents an employer's accelerated contribution of funds needed to finance employees' pension rights which have vested at the time of withdrawal but which have not been fully funded at that date."  Id.

The next statutory scheme which must be discussed is the Bankruptcy Code's priority treatment of administrative expenses incurred by a debtor estate.  Title 28 U.S.C. § 507 provides the order in which certain priority claims and expenses will be paid from the assets of the bankruptcy estate.  It grants first priority to certain post-petition administrative expenses, including in relevant part those allowed under 28 U.S.C. § 503(b)(1)(A).  28 U.S.C. § 507(a)(1).  In this case, TENJ Pension Fund seeks administrative expense treatment for a portion of its Claim no. 918 under 28 U.S.C. § 503(b)(1)(A)(i).  To constitute an administrative expense under that provision, the claim against the estate must be one for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case."  28 U.S.C. § 503(b)(1)(A)(i).  For the protection of other creditors, the definition of administrative expense under section 503(b) is narrowly construed and is limited to "costs that were actually and necessarily incurred in preserving the estate for the benefit of its creditors."  In re Molnar Bros., 200 B.R. 555, 558  (Bankr. D.N.J. 1996).  On the other hand, giving such administrative expenses first-in-line treatment "advance[s] the estate's interest in survival above all other financial goals."  Zagata Fabricators, Inc. v. Superior Air Products, 893 F.2d 624, 627 (3d Cir. 1990).  To receive priority administrative treatment, the expense must meet two criteria: (1) it must arise from a post-petition transaction between the creditor and the debtor and (2) it must be for the benefit of the estate.  In re O'Brien Envtl. Energy Inc., 181 F.3d 527, 533 (3d Cir. 1999).  As to the latter element, the focus is on whether the expense was necessary to preserve the value of the estate.  Id.  A necessary expense of preserving the estate is not limited to one without which rehabilitation of the estate would be impossible but rather more broadly includes "costs

ordinarily incident to operation of a business." Commonwealth of Pa. Dep't of Envtl. Res. v. Tri-State Clinical Labs., Inc., 178 F.3d 685, 689 (3d Cir. 1989) (quoting Reading Co. v. Brown, 391 U.S. 471, 483 (1968)).  Construing the statutory definition of administrative expense, the Third Circuit has observed that "the language of § 503(b), read as a whole, suggests a quid pro quo pursuant to which the estate accrues a debt in exchange for some consideration necessary to the operation or rehabilitation of the estate. Priority, therefore, is afforded such expenses to compensate the providers of necessary goods, services or labor." Id. at 689-690.

Appellant TENJ Pension Fund, as the claimant seeking priority treatment of its claim, bears the burden of establishing that the expense claimed qualifies as an "administrative expense" under the Bankruptcy Code.  In re Molnar Bros., 200 B.R. at 559.  It argues on appeal that the portion of Debtor Marcal's withdrawal liability relating to pension benefits accrued by bargaining unit employees in their post-petition employment with Marcal constitutes an administrative expense within the meaning of section 503(b).[4]  This Court finds that Appellant has met its burden.

Employing workers, such as the truck drivers represented by Local 560, was clearly necessary to the continued operation of Debtor Marcal.  The estate unquestionably benefitted from the bargaining unit employees' continued labor for Marcal after it had filed for bankruptcy.  In consideration of this labor, debtor-in-possession Marcal continued to honor the collective

---

[4] TENJ Pension Fund does not contend that any portion of the withdrawal liability claim which may be attributed to Local 560 employees' pre-petition work for Marcal should be considered an administrative expense.  Thus, it appeals the Bankruptcy Court's February 17, 2009 Order only insofar as it denied administrative expense treatment to withdrawal liability attributable to Marcal's employment of the bargaining unit employees after it filed for bankruptcy protection.

9

bargaining agreement. There can be no real dispute that the pension credits to which these truck drivers were entitled under the collective bargaining agreement between Local 560 and Marcal, and then under the memorandum of understanding continuing the agreement's terms, was part and parcel of the employees' bargained-for compensation for their services. See, e.g., 29 U.S.C. § 1002(2)(A) (defining employee pension benefit plan under ERISA to include plans that provide for retirement income or result in deferral of income by employees for certain period, regardless of the method by which contributions to plan are calculated); Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 445 (1999) (noting that employers sponsoring a pension plan garner benefits such as attracting and retaining employees and paying them deferred compensation). All the while that the Local 560 employees worked for debtor-in-possession Marcal, they accrued pension benefits based on that labor. Of course, while the Debtor was still in operation, it made regular contributions to the pension fund. By operation of the MPPAA, Marcal's responsibility to fund future benefits, earned by employees but as-yet not payable to them, sprang upon its cessation of operations and concomitant withdrawal from the pension fund. To the extent the debt to the pension fund for benefits payable at a later date is based on services rendered to Marcal after it had filed for bankruptcy protection, the debt was incurred for the benefit of the estate.

  The Court's view of withdrawal liability, as a debt incurred in consideration for services rendered, is consistent with the Second Circuit's examination of the nature of the obligation in McFarlin's. McFarlin's presented the court with a somewhat similar situation to the one at bar. McFarlin's, which was in business of altering and selling clothing, employed individuals represented by a labor union and covered by a multiemployer pension and benefit plan. McFarlin's, 789 F.2d at 100. The employer filed for bankruptcy on March 16, 1982 and

ultimately ceased operations on November 13, 1982, spurring its complete withdrawal from the plan.  Id. at 100.  The pension fund filed a claim for the amount of withdrawal liability it assessed against McFarlin's as a priority administrative expense claim in the Chapter 11 proceeding pursuant to 11 U.S.C. § 507(a)(1).  Id.  On motion, the Bankruptcy Court reclassified the debt as a general unsecured claim.  Id.  The McFarlin's court approached the question on appeal as this Court has - by stating that whether the employer's "'withdrawal liability' is an administrative expense depends on the consideration supporting the Fund's right to receive it."  Id. at 101.  It concluded that the pension fund's entitlement to pension benefit contributions arises out of the labor provided by employees, id. at 101-02, and reasoned that the structure of the MPPAA confirms that "the liability represents an employer's accelerated contribution of funds needed to finance employees' pension rights which have vested at the time of withdrawal but which have not been fully funded at that date."  Id. at 103.  This Court notes, however, that unlike this action, McFarlin's did not deal with apportionment of withdrawal liability between pre- and post-petition accrual of benefits, even though the labor union employees did work for the debtor-in-possession for a few months.  The McFarlin's court reasoned that as those months of post-petition work were in the same calendar year as the year of withdrawal, they were not part of the

withdrawal liability computation under 29 U.S.C. § 1391 and therefore did not constitute consideration in support of the employer's withdrawal liability.[5] Id. at 104. By contrast, in this case, the Court focuses on whether the withdrawal liability computation should be prorated to reflect that the labor on which some of the employees' vested benefits are based occurred in the post-petition period.

The Court nevertheless remains in agreement with McFarlin's examination of what the debt is rooted in - the accrual of pension benefits by employees in return for their labor. Other courts have likewise understood withdrawal liability to represent an accelerated obligation to pay deferred compensation and contemplated that insofar as the compensation was earned by an employee covered by a multiemployer pension plan during the time he or she worked for the debtor-in-possession, a withdrawal liability claim could be split into pre- and post-petition components. In re Great Northeastern Lumber & Millwork Corp., 64 B.R. 426, 428 (Bankr. E.D.Pa. 1986) ("to the extent withdrawal liability is attributable to post-petition employment, the claim would be entitled to administrative status"); In re Pulaski Highway Express, Inc., 57 B.R. 502, 508-09 (Bankr. M.D.Tenn. 1986) ("Because the 'claim' for bankruptcy purposes arises from the accrual of employees' vested rights rather than the act of withdrawal, and because the debtor did have short period of post-petition operations, a portion of [the multiemployer pension plan's] claim is properly characterized as post-petition"); In re Cott Corp., 47 B.R. 487, 491-92 (Bankr.

---

[5] Section 1391 provides various methods for computing a withdrawing employer's allocable share of the pension plan's unfunded vested benefits. Three of these methods base the computation on the employer's share of the plan's contribution base ending with the year *before* withdrawal, while a fourth seeks to capture unfunded vested benefits attributable to the employer's employees. See In re HNRC Dissolution Co., 396 B.R. at 472, n.11 (citing Jayne E. Zanglein & Susan J. Stabile, ERISA Litigation 1238-39 (2d ed. 2005)).

D. Conn. 1984) ( finding that withdrawal liability claim should be prorated based on pre-petition and post-petition portions of year because "[a]s Teamster employees worked postpetition, they acquired pension credits for which the [multi-employer] Fund is liable."). In <u>Pulaski</u>, the Bankruptcy Court observed in dicta that such apportionment of a withdrawal liability claim to reflect the accrual of rights to pension benefits for services rendered to the bankruptcy estate

> conforms with the Code's fundamental policies of equity of distribution and of encouraging entities to do business with the post-petition debtor. Employees who work post-petition must assume that until their collective bargaining agreement with the debtor is affirmatively rejected, the compensation and benefits which they have previously bargained for will have post-petition attributes, including the possibility of administrative expense treatment to the extent that services rendered satisfy 11 U.S.C. § 503(b).

<u>Pulaski</u>, 57 B.R. at 508. In <u>Cott</u>, the Bankruptcy Court dealt with a withdrawal liability claim by a multi-employer pension plan which encompassed plan underfunding attributable to both pre- and post-petition employment. The <u>Cott</u> court in fact allowed administrative expense treatment for the share of the claim proportional to the post-petition period, as the estate had benefitted from the covered union employees' services. <u>Cott</u>, 47 B.R. at 494-95. This nuanced treatment of withdrawal liability, as capable of apportionment between pre- and post-petition accrual of an employee's future pension benefit, permits priority administrative expense status of some of a debtor's liability to a multiemployer pension fund and thus furthers the Bankruptcy Code's concern with encouraging the continued operation of the debtor and preservation of the estate for benefit of its creditors. The parties have not indicated that ERISA would prohibit such apportionment, and the Court heeds ERISA's directive that it is not be construed to impair operation of any other law of the United States. 29 U.S.C. § 1144(d).

Arguing that the nature of withdrawal liability renders it completely inconsistent with the requirement that an administrative expense be for the benefit of the bankrupt estate, Appellees rely principally on HNRC. In that case, the Bankruptcy Appellate Panel of the Sixth Circuit rejected a multiemployer pension plan's effort to obtain administrative expense treatment for its withdrawal liability claim against the debtor. In re HNRC Dissolution Co., 396 B.R. at 481. Concluding that the bankruptcy court had properly disallowed the administrative expense claim, the Bankruptcy Appellate Panel held that because the amount of withdrawal liability is always dependent on factors that are not directly related to the post-petition work of a debtor's employees, withdrawal liability cannot be considered a debt incurred for the direct benefit of the estate. Id. at 479-80. It reasoned that because withdrawal liability is necessarily susceptible to numerous factors unrelated to plan-covered employees' services to the estate, it lacks the direct causal link to their post-petition work that typical administrative expen wages or normal contributions to the plan have. Id.

Appellees' argument, and HNRC's analysis, miss the mark by focusing on the manner in which the assessment is computed rather than on the nature of the obligation itself. In essence, withdrawal liability constitutes an acceleration of the employer's obligation to contribute towards the funding of pension benefits accrued by employees pursuant to agreement between the employer and the labor union which represents the employees. Because of the accelerated nature of the payment, and because of the law's concern with underfunded pension funds, the formula used to calculate the amount of liability will of course be based on factors that do not relate to the services rendered, such as assumptions that must be made to calculate the present value of vested

14

benefits. The obligation to make such payment, however, would not exist but for the insolvent employer's deliberate decision to use the services of the covered employees pursuant to the terms of compensation negotiated in the collective bargaining agreement. Put differently, a portion of the accelerated pension funding is premised on the bargaining unit employees' earned credit toward their future right to collect pension benefits in consideration of their work for the debtor in possession. Instead of financing the deferred compensation through monthly contributions, as it would do if it continued to participate in the multiemployer fund, the withdrawing employer is required to make a lump sum payment to the fund. Neither this requirement, nor the existence of insurance provided by the Pension Benefit Guaranty Corporation for benefits owed to covered employees by the fund, alter the basic character of the withdrawing employer's debt - that is, incurred in return for the employees' service to the employer post-petition.

The Local 560 employees who worked for Marcal after it had filed for bankruptcy protection earned immediate and deferred compensation for that labor. The withdrawal liability assessed against Marcal represents its responsibility for ensuring that the employees' vested pension benefits will be funded on a future date when the employees may actually collect their deferred payment. Pro-rating the share of withdrawal liability proportionate to post-petition labor and allocating that amount as a post-petition administrative expense guarantees that the bankrupt, here Marcal, will pay the compensation to which its employees are entitled. Failure to charge the post-petition portion of withdrawal liability as an administrative expense against the estate, payable as the first priority, would in essence give the debtor a free ride on the labor of its employees. It would create a situation in which a debtor can reap the fruits of its workers'

services without meeting all of its compensation obligations, expecting the workers to gamble on whether or not the employers who remain in the multiemployer pension plan will be able to fund the vested benefits.  This result is not only inequitable but also precisely opposite to what the MPPAA intended.

  Having concluded that a withdrawal liability claim can be divided into pre- and post-petition portions, the Court further finds that TENJ Pension Fund has established both prongs of the test for administrative expense as to the portion of the claim attributable to the post-petition period of employment.  That portion of Marcal's withdrawal liability, which is grounded in the post-petition accrual of pension benefits by Marcal's Local 560 employees, clearly arises of out a post-petition transaction with the estate, that is, out of the Debtor's employment of bargaining unit workers covered by the TENJ Pension Fund.  This transaction necessarily included the agreement that in return for their work for Debtor Marcal, the Local 560 employees would earn credit toward their pension, provided by the TENJ Pension Fund.  After filing for bankruptcy, Marcal did not reject the collective bargaining agreement with Local 560.  Marcal's accelerated funding of the pension benefits accrued by the workers in the post-petition period is an expense incurred for the benefit of the estate, as expenses related to securing and maintaining employees are undoubtedly necessary to the preservation of the estate.

  The Court will enter an order reversing the Bankruptcy Court's order of February 17, 2009 insofar as it disallowed administrative expense status for the amount of post-petition withdrawal liability claimed by TENJ Pension Fund and reclassified the entirety of Claim no. 918 as a general unsecured non-priority claim.  The Bankruptcy Court did not, however, have the

benefit of a proposed apportionment of the claim between the pre- and post-petition components of the withdrawal liability claim.  On appeal, TENJ Pension Fund has, in its reply papers, submitted a withdrawal liability calculation that does distinguish between funding for benefits vested before Marcal filed for bankruptcy and those that vested afterwards and provides an amount based on the employees' post-petition work hours.  (See Certification of Thomas D. Levy.)  The parties all acknowledge, however, that there is no settled method of apportioning withdrawal liability, and Appellant states in its reply brief that courts addressing the apportionment issue have discussed two different methods.  The Court will accordingly remand this action to the Bankruptcy Court for reclassification of Claim no. 918 in accordance with this Opinion and will thus permit the Bankruptcy Court, Appellees and any other interested party the opportunity to review the calculation provided by TENJ Pension Fund.

### III.   CONCLUSION

For the foregoing reasons, this Court will grant TENJ Pension Fund's appeal and issue an Order reversing February 17, 2009 Order of the Bankruptcy Court insofar as it reclassified all of Claim no. 918 as a general unsecured non-priority claim and remanding to the Bankruptcy Court for reclassification of the claim in accordance with this Opinion.  An appropriate form of order will be filed.

                                                  s/Stanley R. Chesler
                                                  STANLEY R. CHESLER
                                                  United States District Judge

DATED: November 2, 2009